(136 So. 91)

## CITY OF NEW ORLEANS v. NEW ORLEANS LAND CO. et al.

### No. 31138.

June 22, 1931.

Rehearing Denied July 17, 1931.

Warren Simon, Roger Meunier and Delvaille H. Theard, all of New Orleans, for appellants.

Michel Provosty, City Atty., Francis P. Burns and Walter M. Barnett, Jr., Asst. City Attys., all of New Orleans, for appellee.

BRUNOT, J.

This is one of five expropriation suits instituted by the plaintiff against the New Orleans Land Company and different codefendants, but involving the same issues. The suits were filed December 7, 1925, and on the following day the plaintiff, to prevent interference with the proceedings and to maintain the status of ownership, filed notices of lis pendens.

Three issues are presented, viz.: The right to expropriate; the value of the property if the necessity for its expropriation exists; and legal interest thereon from December 8, 1925, the date on which notice of lis pendens was filed.

From a judgment of the civil district court, of the same tenor in each case, decreeing the right of the plaintiff to expropriate the property upon payment of $7,200, the value thereof as fixed by the verdict of the jury, the several defendants perfected separate appeals, and a separate transcript is filed in each case.

The plaintiff has answered the appeals and prays that the judgment in each case be amended by reducing the amount thereof from $7,200 to $4,500, and that the appellants be taxed with the cost of the transcript in four of the appeals.

The property involved in each case consists of one square of ground. The title to the five

squares is in the New Orleans Land Company, but under purchase and sale agreements between that company and its respective co-defendants, who are made parties defendant for that reason, each one of said squares is affected thereby together with a "Bond for Deed."

With respect to the right of the plaintiff to expropriate the property, we quote from Corpus Juris, vol. 20, p. 551 et seq., the following:

"The determination by a municipality that the use for which it is appropriating property is public is subject to review by the courts, but the question of use will be scrutinized less closely when it is to be vested in a municipal corporation or other public agency, or in the State, than when it is to be vested in a private corporation. The motives of the members of a city council are not open to judicial inquiry, except in case of fraud and collusion with private interests, and it has been held in some jurisdictions that when a municipal corporation has jurisdiction to take land for public streets or parks, the determination of the question of public use by the proper municipal officers is conclusive on the courts in the absence of fraud.

"No general definition of what degree of public good will meet the constitutional requirements for a 'public use' can be framed, as it is in every case a question of public policy. The meaning of the term is flexible and is not confined to what may constitute a public use at any given time, but in general it may be said to cover a use affecting the public generally, or any number thereof, as distinguished from particular individuals. Some courts have gone so far in the direction of a liberal construction as to hold that 'public use' is synonymous with 'public benefit,' 'public utility' or 'public advantage,' and to au-thorize the exercise of the power of eminent domain to promote such public benefit, etc., especially where the interests involved are of considerable magnitude, and it is sought to use the power in order that the natural resources and advantages of a locality may receive the fullest development in view of the general welfare. * * * Other courts, however, have adopted a strict construction, holding in effect that 'public use' means use by the public. * * * Under this view it is essential to constitute a public use that the general public have the right to a definite and fixed use of the property appropriated, not as a mere matter of favor or by permission of the owner, but as a matter of right. * * * The character of the use, and not its extent, determine the question of public use. It is not essential that the use or benefit extend to the whole public or any considerable portion thereof, nor that each and every individual member of the community have the same degree of interest therein; the fact that the use and benefit is limited to the inhabitants of a small locality, or that the number of persons who are expected to avail themselves thereof is small, is immaterial provided it is open to all upon the same terms."

The same principles are announced in Am. & Eng. Ency. of Law, vol. 10, p. 1061 et seq., and in R. C. L., vol. 10, p. 31 et seq.

The five squares of ground the plaintiff seeks to expropriate are on the North side of Taylor avenue. Immediately in the rear of these squares and running to Lake Pontchartrain is a tract of land containing 1,000 acres which the plaintiff acquired from the New Orleans Land Company for park purposes. The actuating reason for these suits is accurately stated in defendants' brief, as follows:

"The five squares now in controversy, had originally been included in this large tract;

and the City of New Orleans expected to acquire, as a part of the large tract, and by purchase from the New Orleans Land Company, these five squares; the City in the negotiations with the New Orleans Land Company having erroneously assumed that these five squares belonged to the New Orleans Land Company. When it was discovered, much to the City's dismay, that these squares had been sold, in 1921, by the New Orleans Land Company to the present owners, the present appropriation suit was immediately brought by the City with the active assistance of the New Orleans Land Company," etc.

The New Orleans Land Company had not divested itself of title to the squares, but they were affected by agreements of sale and bonds for deed. In considering whether or not the squares involved are necessary for the general use, the learned judge of the civil district court says:

"Whenever the functions for which the municipality or public utility corporation is created, to give service to and benefit the community, could be better, more conveniently, more beneficially exercised by owning the property than it could without the possession of the real estate, then that real estate has become necessary for public use. * * * The true test is, could the public servant, whether the municipality or the public utility corporation, better, more conveniently, more beneficially serve the public by the acquisition of the land than it could without it. If it can, then the question is solved in favor of the right to expropriate."

■ Our conception of the law is that where the state or a municipality seeks to acquire property by the exercise of the power of eminent domain, the primary question is whether or not the taking is for the public use. In the cases we are considering, it is shown that the taking is for the enlargement of a public park. The park's board members testified not only to the public use to which the property would be dedicated, but also to the necessity for its taking. The defendants offered no proof in rebuttal of that testimony. The only evidence offered by them was upon the question of the value of the property. In argument and brief, counsel stress the city's financial inability to develop the park extension. That is a matter which addresses itself to the judgment and discretion of the commission council rather than to the judiciary.

■■ With respect to the value of the property involved, it is shown that the five squares were a part of the larger tract now owned by the plaintiff. In 1925, when these suits were filed, the entire tract was undeveloped swamp land and inaccessible for practical purposes. Owing to the more favorable location of defendant's squares, and to the fact that they were somewhat higher than the adjoining lands on the lake side of them, and to some extent were benefitted by the drainage of other property in their vicinity, they had some value in excess of the lands of the thousand-acre tract. The testimony as to their value at that time is conflicting. It ranges from $4,500 to $20,000 per square. Neither the high estimate of Mr. Dionne or the low estimate of Mr. Tessier have any substantial basis. Four years prior to the filing of these suits, the defendants contracted to purchase the five squares at a price of $5,200 per square, and it appears that, during that period, the land enhanced in value. Counsel for defendants contend that we should disregard the verdict of the jury, because the plaintiff as well as the defendants are dissatisfied with it. Counsel overlooks the fact that in expropriation suits the jury is selected from the vicinage, that they are property holders therein, and their sole function is to value the property sought

to be expropriated, and in the performance of this duty they sit as sworn experts. For these reasons the courts properly give their findings great weight, regardless of the views of the litigants, and, unless it be found that their award is manifestly unreasonable, it will be affirmed.

We have read the record carefully, and have failed to find therein sufficient warrant for disturbing the verdict of the jury.

■ The contention of defendants that they should be awarded legal interest because their property was taken out of commerce by the filing of notices of lis pendens is fully answered by the trial judge. We quote from his opinion, with approval, the following:

"The argument is one that strongly appeals to the sympathies of the court, but the question that confronts the court is, whether it can grant the relief as prayed for.

"Article 1935 of the Civil Code gives the real definition of legal interest. That Article reads:

" 'The damages due for delay in the performance of an obligation to pay money are called interest. The creditor is entitled to these damages without proving any loss, and whatever loss he may have suffered he can recover no more.'

"Setting aside conventional interest which is allowed to spring into existence from a convention or contract, all other interest is simply allowable as damages for the failure to pay money when due. Therefore, the money must be due and must be demandable in order to have legal interest charged against or inflicted upon the party owing the money. It is necessary to show that the money was due, exigible and demandable.

"In this case, for the court to allow interest, it would be necessary for the court to find that on the day the lis pendens was filed in the Mortgage Office, the amount, as the price of the property, had been fixed and was due and demandable.

"As a matter of fact, had the price been fixed by the jury on the day the lis pendens was filed, the law is, there is no obligation on the Sovereign or any of its delegates, to pay the money, but that neither the Sovereign or any of its delegates shall be permitted to take possession of the property until it pays the money."

The prayer of plaintiff's answer to the appeal relative to a reduction of the jury's award is disposed of by our comment on the testimony of Mr. Tessier, and with reference to taxing the defendants with the cost of four of the transcripts of appeal we will say that while there was an agreement had in the lower court, by which all of the cases were consolidated for submission at one time and to one jury, there was no agreement that all of the cases would be brought up in one transcript.

For the reasons stated, the judgment herein is affirmed.